J-A28017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.M.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 793 MDA 2021 |

Appeal from the Decree Entered May 26, 2021
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2097 of 2019

| | | |
|---|---|---|
| IN RE: L.S.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D.C, MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 794 MDA 2021 |

Appeal from the Decree Entered May 26, 2021
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2098 of 2019

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED: JANUARY 19, 2022**

Appellant A.D.C. (Mother) appeals from the decrees granting the petitions of Appellee the Lancaster County Children and Youth Service Agency

---

[*] Former Justice specially assigned to the Superior Court.

(Agency) to terminate her parental rights to B.M.F. and L.S.F. (collectively, Children) pursuant to 23 Pa.C.S. § 2511(a) and (b).[1]  We affirm.

The trial court summarized its findings of fact as follows:

1. L.S.F. was born [in June 2017].

2. B.M.F. was born [in September 2012].

3. In the spring of 2018, the Lancaster County Drug Task Force was engaged in surveillance of the home of Mother and Father [(collectively, parents)].

4. The Agency, after being advised of the Drug Task Force investigation, began an investigation into the safety of L.S.F.

5. At this time, B.M.F. was staying with a relative under an informal arrangement and was not residing with Mother and Father.

6. The Agency filed its petition for custody of L.S.F. on April 10, 2018.

7. At the adjudication disposition hearing held on April 26, 2018, the parents were granted a child's permanency plan [for L.S.F.]. The plan established a primary permanency goal of return to parent and a concurrent permanency goal of placement for adoption.

8. The child's permanency plan for L.S.F. had the following objectives for both parents: (a) to improve mental health functioning to the extent that the parents can care for the child; (b) to remain free from drugs and misuse of alcohol; (c) to learn and use good parenting skills; (d) to be financially stable in order to provide for themselves and the child; (e) to obtain and maintain a home free and clear of hazards for themselves and the child; and, (f) to maintain an ongoing commitment to the child.  In addition, Mother's part of the child's permanency plan also had the objective of remaining crime-free.

_____

[1] This Court consolidated Mother's appeals on July 6, 2021.  We separately consider the appeals of the Children's father, E.T.F. (Father) at 859 and 860 MDA 2021 in J-A28018-21.

9. Approximately one month after L.S.F. came into the Agency's care, B.M.F.'s caregiver requested that B.M.F. be removed from her care and the Agency then filed a petition for custody of B.M.F. [On August 2, 2018, the trial court adjudicated B.M.F. dependent.]

10. In respect to B.M.F., on August 2, 2018, the parents were granted a child's permanency plan with a primary permanency goal of return to parent and a concurrent permanency goal of adoption.

11. The child's permanency plan for B.M.F. had the following objectives for both parents: (a) to improve mental health functioning to the extent that the parents can care for the child; (b) to remain free from drugs and misuse of alcohol; (c) to learn and use good parenting skills; (d) to be financially stable in order to provide for themselves and the child; (e) to obtain and maintain a home free and clear of hazards for themselves and the child; (f) to maintain an ongoing commitment to the, child; and (g), to develop an understanding of sexual victimization. In addition, Mother's child's permanency plan also had the objective of remaining crime-free.

12. The overriding concerns for both parents that necessitated placement of the Children were mental health concerns affecting the parents and substance abuse by the parents, along with Mother's involvement with the criminal justice system.

13. The parents made substantial progress on their . . . permanency plan objectives between August of 2018 and February of 2019.  Consequently, the Agency recommended release of physical custody of the Children to them, which the court granted on February 7, 2019.

14. A family service plan was approved which required the parents to continue to engage in drug and alcohol treatment, submit to random drug screens, continue with the parent educator, and ensure the safety of the Children.  The parents were advised that failure to abide by the family service plan would result in the Children being re-placed into the care of the Agency.

15. On February 22, 2019, the Agency was notified that L.S.F. had some type of seizure and had been admitted to Hershey Medical Center.

16. The parent educator was present in the home when she observed L.S.F. acting strangely; it was the parent educator who

insisted that L.S.F. be taken to Hershey Medical Center, not the parents.

17. L.S.F.[, who was less than two years old at the time,] ingested some type of amphetamine that caused her to have a seizure.

18. Upon notification that L.S.F. was at Hershey Medical Center, a drug screener was sent to the home of the parents. Mother tested positive for cocaine and the Agency again filed for physical custody of the Children. [The trial court granted the Agency temporary custody of the Children on February 22, 2019, and entered a shelter care order placing the Children in the Agency's care on March 6, 2019.]

19. The parents did not offer an explanation as to how [L.S.F.] ingested the amphetamine.

20. After the re-placement of the Children, the parents were again given child[ren's] permanency plans for reunification with the same objectives as were on the prior plans, with the exception that the plan in respect to B.M.F. omitted the objective to develop an understanding of sexual victimization which had been included in the previous child's permanency plan. [The Agency placed the Children with their current resource parents in June 2019].

21. The parents had not completed the parenting objective at the time of the re-placement.

*    *    *

24. Following the re-placement of the Children, Mother did not work on her mental health or drug/alcohol objectives and she was arrested in June 2019[,] for a probation violation.

25. Between February and June 2019, the parents avoided being drug-screened.

26. The parents had undergone psychological evaluations at the beginning of the case and the recommendations were for mental health treatment, drug and alcohol evaluations, and medication management. . . .

27. The parents indicated that each of them is preventing the other parent from being successful in completing their child permanency plan objectives. They have a co-dependent relationship.

28. Mother and Father's co-dependence has prevented them from being able to parent the Children and the passage of time confirms their co-dependence will continue.

29. Mother was discharged from her drug and alcohol counseling on May 28, 2019, for noncompliance with the attendance policy.

30. Mother admitted to using cocaine on June 24, 2019. She subsequently refused a drug screen and then admitted to using cocaine again on August 13, 2019.

31. Mother was unsuccessfully discharged from a second drug/alcohol provider on August 13, 2019.

32. Mother has been in an inpatient residential substance abuse programs four times[,] and she has not successfully completed any one of them.

33. At the permanency review/termination of parental rights hearing held on April 9, 2021, Mother claimed she had completed drug and alcohol counseling at the Naaman Center. However, Mother never provided verification of such to the caseworker.

34. On May 18, 2019, the Agency caseworker offered to drive Mother to meet with her probation officer, which Mother declined to do, resulting in Mother being arrested on June 4, 2019. [On September 3, 2019, the Agency filed petitions to terminate parents' rights to the Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b).[2]]

35. Mother was arrested again on December 12, 2019, for another probation violation.

\* \* \*

42. The parents briefly worked with a parent educator prior to the re-placement of the Children, but due to their non-compliance with the drug and alcohol and mental health objectives after the Children came back into the Agency's care, a parent educator had not yet been re-assigned to them as of September 3, 2020.

_____

[2] The trial court by order dated January 17, 2020, appointed Kathleen E. Holmes, Esq. as the Children's legal interest counsel. **_See generally In re Adoption of L.B.M._**, 161 A.3d 172 (Pa. 2017). Gina M. Carnes, Esq. appeared as the Children's guardian _ad litem_ (GAL).

43. . . . Mother has two [other] older children, one of whom was approximately 19 years old and a younger [child] about 10 years of age as of September 3, 2020. [The] younger child is being raised by his father.

44. Mother has habitually missed appointments with her probation officer.

45. Mother experienced a highly traumatic event when she was nine years of age. The mobile home she was living in was swept away in a flash flood[,] and her twelve year old friend drowned.

46. . . . Mother ha[s] maintained employment through the history of the case.

47. In general, . . . Mother's visits with the [C]hildren have gone well.

48. Mother missed three or four consecutive visits with the Children from June to August 2019.

49. B.M.F. gets upset when Mother fails to appear for visits.

50. During visits, Mother and Father have an over-reliance on phones and food to keep the Children engaged.

51. The parents have resided together for the duration of this case.

52. The re[-]placement into the physical custody of the Agency was devastating for the Children.

53. When B.M.F. was re-placed, she was picked up from school and was devastated and hysterical.

54. B.M.F. is always concerned that her parents are happy and does not want to say or do something that would upset them.

55. B.M.F. knows that she is not safe with her biological parents because they use drugs.

56. In January 2020, both parents were attending counseling for drug[s] and alcohol but not counseling for mental health.

57. The parents re-engaged with mental health counseling on June 16, 2020.

58. As a result of the COVID-19 pandemic which caused the imposition of stay-at-home orders beginning in March 2020, the

Agency was unable to drug screen the parents again until July 21, 2020.

59. The results of the July 20, 2020 drug screen[s] were positive for both parents. . . . Mother tested positive for methamphetamine and amphetamine.

\* \* \*

61. As of June 2020, the Children had been in the same resource home for one year. The resource family was and remains a permanent resource for the Children.

62. The bonding assessment concluded that Mother and Father love the Children[,] but they have failed to do the needed things to provide stability for the Children. The evaluator recommended termination of the parental rights.

63. The evaluator noted that during the visit between the parents and the Children that each parent took a child and did something with that child; there was no indication of a sense of family or a connection between the [Children].

64. During the visit between the . . . parents and the Children, the evaluator noted that the parents used their phones as a distraction instead of engaging with the Children.

65. The evaluator noted that B.M.F. is much more bonded to her . . . parents than is L.S.F., as L.S.F. has spent practically her entire life with the resource family.

66. The evaluator supports the Children having ongoing contact with the . . . parents as long as the Children desire it.

67. B.M.F. is presently engaged in school-based counseling.

68. The resource parents had adopted another child with whom the two girls have a close relationship.

69. The child preparation worker had worked with B.M.F. for four rounds of ten one-hour sessions over a period of 18 months.

70. According to the child preparation worker, B.M.F. knows why she was placed in the custody of the Agency and then re[-]placed the second time.

71. The child preparation worker's last session with B.M.F. was in approximately October of 2020.

72. At that last session, B.M.F. indicated she loves her biological parents as well as her resource parents but she is reluctant to state her love for the resource parents because that would hurt her biological parent's feelings.

73. At the time of the last permanency review hearing, the Children had been in the care of the Agency for three years, less the two weeks with the biological parents before being re-placed, and the parents still had not completed their child permanency plan objectives.

74. L.S.F. is adamant that she wants to live with the resource parents.

75. B.M.F., in the five months prior to the April 9, 2021, hearing, stated to [the GAL] that she wants to live with the resource parents but would like to still see her . . . parents.

76. B.M.F. called her legal interest attorney on February 2, 2021, and was very upset because she had a bad dream the night before. In her dream, B.M.F. and L.S.F. were living with their . . . parents and L.S.F. ate something bad and died.

77. B.M.F. told her legal interest attorney she wants to live with the resource family but fears her . . . parents will be mad when they hear that.

78. The [court appointed special advocate (CASA)] recommended to the court that the parental rights should be terminated.

79. The Children's [GAL] recommends termination of the parental rights.

Trial Ct. Op., 8/10/21, at 31-43 (citations omitted). On May 26, 2021, the trial court entered decrees terminating Mother's parental rights.

Mother timely filed notices of appeal and statements of errors complained on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive opinion.

Mother presents the following question for review:

Whether the [trial c]ourt erred in terminating Mother's parental rights to the [Children] because the [Agency] failed to prove by clear and convincing evidence that Mother's parental rights should be terminated under 23 Pa.C.S.[ §§] 2511(a)(1), (a)(2), (a)(5), (a)(8), and 2511 (b)?

Mother's Brief at 8.

Initially, we note that the following principles govern our review.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1123-24 (Pa. 2021)

(emphasizing that "[w]hen a trial court makes a 'close call' in a fact-intensive case . . . the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court").

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). This Court "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." *In re M.T.*, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

**Involuntary Termination Under Section 2511(a)(2)**

We first address the involuntary termination of Mother's parental rights under Section 2511(a)(2). *See id.* Mother contends that she substantially

complied with the Children's permanency plans and made progress towards her goals. Mother's Brief at 12, 16. Mother asserts that the conditions that led to the Children's placement no longer exist. *Id.* at 12-13. Mother argues that she completed a drug and alcohol program and that the Agency failed to "clearly communicate with her, especially in regard to her mental health and parenting objectives." *Id.* at 12, 17-18.

Mother continues that L.S.F. suffered an "unexplained medical emergency" in February 2019, and she emphasizes that the Agency filed the petitions to terminate her parental rights to the Children only seven months after L.S.F.'s medical emergency. *Id.* at 12. Mother adds that the COVID-19 emergency "created undue hardship and delays" in the completion of her goals, because the Agency stopped in-person visits from December 2020 until March 2021, and the Agency denied her requests to speak with the Children on their birthdays and holidays. *Id.* at 12, 19. Mother further asserts that the trial court minimized her mental health issues and the effects of her childhood traumas. *Id.* at 12.

The Agency, the GAL, and the Children's legal counsel respond that the Agency presented clear and convincing evidence to terminate Mother's parental rights under Section 2511(a)(2). Agency's Brief at 14-15; GAL's Brief at 14-15; Legal Interest Counsel's Brief at 4. According to the Agency, Mother did not assert that she completed drug and alcohol treatment until the final termination hearing and that she failed to notify her caseworker. Agency's Brief at 20. Further, the Agency asserts that the record belies Mother's

arguments concerning the Agency's efforts to promote reunification. *Id.* at 21.

Section 2511(a)(2) states:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

This Court has addressed the incapacity to parent under Section 2511(a)(2) as follows:

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*S.P.*, 47 A.3d at 827 (citations omitted). This Court has noted that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Instantly, the trial court concluded that the termination of Mother's parental rights was proper pursuant to Section 2511(a)(2). The trial court reasoned:

> Mother testified at the April 9, 2021, hearing (which was the final hearing in respect to the termination of parental rights action) that she finally completed the drug and alcohol objective but she failed to inform the caseworker. After Mother's four failed attempts, it is questionable as to whether Mother will be able to maintain sobriety. . . . The parent's plan objective in respect to parenting skills was not completed. . . . Mother['s] mental stability and history of substance abuse casts a huge shadow over [her] ability to provide a safe home, parental care, and stability for the Children. Mother['s] refusal to address those risks render[s her] incapable of providing the essential care the Children need to flourish.

Trial Ct. Op. at 25-26.

We conclude that the record supports the trial court's findings of fact, legal conclusions, and analysis. The Agency opened the case in 2018, and Mother had nearly three years to demonstrate her capacity to provide essential care of the Children. Mother progressed or satisfied several goals including housing and employment and her early successes resulted in the return of the Children to the parents' home in February 2019.

However, Mother continued to have difficulties with drug abuse. As the trial court noted, Mother had a history of attending inpatient programs between 2011 and 2017 without success. Following the second removal of the Children from the parents on February 22, 2019, Mother refused drug screens but admitted to using cocaine. *See* N.T., 9/3/20, at 20. Mother was unsuccessfully discharged from a drug and alcohol program in May 2019 for

lack of attendance. *Id.* at 18. Mother's refusal of a drug screen resulted in her discharge from a dual diagnosis program in August 2019. *Id.* at 20. Mother also tested positive for cocaine in September 2019. During this time, Mother was also arrested for a probation violation on June 4, 2019. *See id.* at 21.

After the Agency filed its petition to terminate Mother and Father's parental rights to the Children on September 3, 2019, Mother was arrested for another probation violation in December 2019. *See id.* at 22. Mother also once tested positive for amphetamines or methamphetamines in July 2020, although she asserted that she tested positive because of over-the-counter energy pills she purchased on Amazon. *See id.* at 66-67.

Additionally, Mother's difficulties with drug use prevented her from obtaining a referral for parenting classes. *See id.* at 68. Mother also had not been attending mental health counseling when the Agency filed the petition to terminate her parental rights, and the Agency caseworker indicated that Mother was not engaging in mental health counseling as late as June 2020. *See id.* at 64-66.

The trial court acknowledged Mother's recent progress in working on her drug and mental health issues before the last termination hearing on April 9, 2021, and indeed the trial court found Mother to be in substantial compliance at that time. *See* N.T., 4/9/21 at 58, 146. However, given the evidence stated above, we conclude the record supports the trial court's determinations that Mother's more recent efforts to maintain sobriety were "questionable"

and that Mother's mental health issues "casts a huge shadow over [her] ability to provide a safe home, parental care, and stability for the Children." **See** Trial Ct. Op. at 50. Further, we discern no merit to Mother's argument that the trial court failed to consider Mother's traumatic past or that the court erred in not considering her problems with the Agency and the COVID-19 pandemic which blocked the completion of her objectives.

For these reasons, we affirm the trial court's conclusions that the Agency presented clear and convincing evidence that Mother's repeated and continuing incapacity caused the Children to be without essential care and that Mother could not remedy the causes of the incapacity. Accordingly, we do not disturb the trial court's decision to terminate Mother's parental rights pursuant to Section 2511(a)(2). **See S.K.L.R.**, 256 A.3d at 1123-24; **S.P.**, 47 A.3d at 826-27.

### Section 2511(b) Determinations

Next, we review the trial court's determination that the involuntary termination of Mother's parental rights best serves the Children's developmental, emotional, and physical needs pursuant to Section 2511(b). Mother asserts that severing the bond between the Children and the parents "would be especially difficult for [B.M.F.], who is particularly close to Father." Mother's Brief at 20. Mother also argues that the evidence established: (1) the resource mother suffered from anxiety; (2) the resource parents had a "conservative lifestyle," including a focus on the Children's church activities and homeschooling, against which the Children might rebel; (3) B.M.F.

remained "torn" about where she wants to live; and (4) the continuing need for "professional intervention" for resource parents to provide for B.M.F.'s needs. *Id.* at 20-23. Mother emphasizes the evidence that it was important for the Children to maintain contact with the parents, but she claims that the resource parents' willingness to permit continued contact was "doubtful." *Id.* at 21.

The Agency asserts that the record belies Mother's arguments concerning the resource mother's anxiety, and the effects of termination of her parental rights to the Children. Agency's Brief at 21. The Agency notes that the bonding evaluator, Diane Edmonds, M.S., opined that the termination of Mother's parental rights was in the Children's best interests. *Id.* at 24-25. Further, the Agency contends that the record does not support Mother's arguments concerning the resource parents. *Id.* at 25.

Section 2511(b) provides as follows:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

It is well settled that

> [t]he emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." . . . [T]his Court held that the determination of the child's "needs and welfare" requires consideration of the emotional

bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

With respect to the bond analysis pursuant to Section 2511(b), the *T.S.M.* Court explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *Id.* "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, in weighing the bonding considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.* at 269.

Instantly, the trial court explained that its conclusion that termination of Mother's parental rights was in the Children's best interests as follows:

> Here, the court had the benefit of an expert evaluator's assessment of the bond between the Children and the parents. The expert evaluator opined that there is a bond between Mother and Father and the Children and that the parental bond is particularly strong with B.M.F. and but not with L.S.F. However, the risks that caused the placement of the Children in the first place continue to exist. The evaluator concluded that termination of the parental rights is in the best interest of the Children. Mother and Father are not capable of providing the stability and security the Children need to flourish. It would be unconscionable to return the Children to an unsafe environment with incumbent risks of further trauma. It is apparent B.M.F. is very close to Mother and Father. This child has nevertheless come to a realization that she

- 17 -

may not be able to return to her biological parents and she is comfortable with the concept of remaining with the resource family as her forever family.

The [GAL] and the Children's legal interest attorney, as well as the Children's [CASA], support termination of the parental rights. The court agrees. The Children deserve permanency and permanency will be achieved only by the termination of Mother and Father's parental rights.

Trial Ct. Op. at 53.

Our review confirms that the record supports the trial court's analysis, findings of fact, and conclusions of law. As the trial court acknowledged, there was a bond between the parents and the Children, in particular, B.M.F., who was nearly six years old when the trial court adjudicated her dependent.[3] Although Ms. Edmonds noted in her initial report that she had concerns that the resource mother's anxiety could negatively impact the Children, she testified that she no longer believed resource mother's anxiety would affect the Children.[4] **See** N.T., 3/11/21, at 23; **see also** Agency's Ex. 2, Bonding

---

[3] As noted above, B.M.F. was living with a relative at the time of her adjudication of dependency. Further, the record shows that at the time when the Agency first removed L.S.F. from her home in 2018, she was less than a year old. Although there was evidence of a bond between L.S.F. and her parents, there was no evidence that termination of Mother's parental rights would impact L.S.F. negatively because of her bonds to the resource parents, her age, and the time spent in the Agency's care.

[4] Specifically, in Ms. Edmonds' bonding evaluation dated January 9, 2020, Ms. Edmonds noted that the resource mother was "highly anxious" when dealing with Mother and Father and lacked insight into how her anxiety affected the Children. Bonding Evaluation at 21. Ms. Edmonds noted that "[c]hildren take emotional cues off of their caregivers [and that] highly anxious parents inadvertently cue their children to believe their world is unsafe." **Id.** Ms.
*(Footnote Continued Next Page)*

- 18 -

Evaluation, 1/9/20, at 21; Agency's Ex. 4, Bonding Evaluation Update, 10/10/20, at 3. Ms. Edmonds further opined that Mother's inconsistent conduct throughout the life of the case caused B.M.F. anxiety and distress, particularly as it related to visitation. *See* N.T., 3/11/21 at 19; N.T., 9/3/20, at 56, 74; Bonding Evaluation at 4, 13. Despite her bonds to the parents, the child preparation worker, Kelly Campbell,[5] testified that B.M.F. understood the situations that caused her removal from the parents' care, has seen a school counselor and Ms. Campbell in anticipation of the termination of the parents' rights, and expressed love for the resource family. *See* N.T., 4/9/21 at 64-67; N.T., 9/3/20, at 75. Lastly, although Ms. Edmonds recommended continued contact between the Children and the parents, she recommended contact in informal settings where B.M.F. would not be distressed if Mother did not show and concluded that the termination of Mother's parental rights

---

Edmonds added that tensions between the resource mother and Mother may contribute to B.M.F. not being closely bonded with the resource mother. *Id.* Ms. Edmonds also stated that she feared that the resource parents' conservative lifestyle could create an environment against which B.M.F., who was more secular, could rebel. *Id.*

However, at the March 11, 2021 hearing, Ms. Edmonds testified that she did not have "any concerns at all" about the resource mother's anxiety. N.T., 3/11/21, at 23. Ms. Edmonds noted that the resource mother was seeing a therapist to address her anxiety. *Id.*

[5] Ms. Campbell testified at the April 9, 2021 hearing and stated that her job was to "answer questions that [a child] has and deal with the very heavy emotions that they may be feeling during that time." N.T. 4/9/21, at 60. She noted that her sessions with children were not therapy. *Id.* at 61.

best served the Children's need for permanency. *See* N.T., 3/11/21, at 49; *see also* Agency's Ex. 2 at 22.

Based on the foregoing, we conclude that the record supports the trial court's determination that the termination of Mother's parental rights served the best interests of the Children. The trial court's determinations concerning the Children's bonds to Mother were supported by the record, and we discern no abuse of discretion in the trial court's conclusion that the Children's interests in stability outweighed the bond that the Children may have had with Mother. Moreover, based on our review of the record and the trial court's analysis herein, we discern no merit to Mother's assertion that the trial court minimized Ms. Edmonds' concerns regarding the adjustments necessary to accommodate B.M.F.'s needs within the resource family. Accordingly, we affirm the trial court's ruling pursuant to Section 2511(b). *See S.K.L.R.*, 256 A.3d at 1123-24; *S.P.*, 47 A.3d at 826-27.

For these reasons, we conclude that the trial court's decisions pursuant to Section 2511(a)(2) and (b) were within its discretion and supported by clear and convincing evidence in the record. Accordingly, we affirm the decrees terminating Mother's parental rights to the Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>01/19/2022</u>